I'm glad to have you here this morning. The first case is Betco v. Peacock & Edel. Mr. Moore. May it please the court, I'm David Moore. My client is Betco. This case is about Betco's claims that it was lied to about the quality of the products produced by the Peacocks when Betco purchased the Peacocks company. And the fact that the customers that Betco acquired as part of that process were also being lied to by the Peacocks by, among other things, in the district court's words, essentially making up certificates of analysis out of whole cloth. The case was pled in contract and in tort. That is of particular significance, as this court knows, under Wisconsin law because of the role played by Wisconsin's version of the economic loss doctrine, although this case is not fundamentally or necessarily about the economic loss doctrine. The appeal is centered on the contract claims that were raised in the complaint. And our position in general, borrowing the words of this court in the Harley Davidson case cited in the briefs, is that the court should not, in the course of analyzing the nature of the causes of action that were pled in this case, quote, drown both contract and tort duties, allowing recovery in neither contract nor tort. The case came to the Wisconsin court. It originated in Ohio, as the court may have seen, in April of 2012 with federal judge, District Court Judge Helmick. Two years later, venue was changed to Wisconsin. And after that, there were two motions for summary judgment decided, one about three and a half months before trial in 2015, and a second decided a week before trial. This appeal concentrates on the ruling primarily in that first summary judgment motion. And in light of the result of those two motions for summary judgment, there was a trial, but the trial was limited to the relatively narrow issue of Betko's claims for a breach of the duty of good faith and fair dealing. So we have issues here that are centered on two general areas of the asset purchase agreement, referred to as the APA in the briefs. We have a one-year limitation on actions created under the terms of the APA, and it's referenced in two places cited in the briefs, both part of Section 2.05. 10.05. 10.05A and E. It's a limitation that expressly does not apply, which is to say the one-year limitation does not apply to certain types of actions, and that includes actions for intentional misrepresentation and intentional breach. 10.05A uses the word intentional misrepresentation. E uses the phrase intentional breach. That's one part of the asset purchase agreement that is of critical importance for purposes of this appeal. The other part of the APA that's important is Section 4.19, and that is the section that says, and I quote, that each item processed or delivered by the seller, in this case the Peacocks, has been in conformity with all applicable contractual commitments and all express and implied warranties. That provision is amplified a few paragraphs later in Section 4.25, which says, and I quote, the representations and warranties contained in this Article 4 do not contain any untrue statement of fact, of material fact, or omit to state any material fact necessary in order to make the statements and information contained in this Article 4 not misleading. The grammar is difficult there. There are a number of places in this agreement where the grammar is difficult, to say the least. Who drafted this? It was an attorney in Ohio, not present in the courtroom that I'm aware of here. I'd like to ask you about another provision in the contract, 10.06. Do you have it available? Yes. This one actually looks pretty coherent and understandable, to me at least, and I'd like you to help me with this because, as I understand it, the principal protection for the buyer in this deal was the $500,000 promissory note to deal with claims that might arise of this sort. Is that right? I think that that's a matter of emphasis. I think that the district court characterized that as an escrow, per se. Yes, okay. And that's not unusual in business deals like this. So 10.06, and that promissory note was released voluntarily early, correct? That's right, at a discount. Right. And then the parties understand that buyers shall first seek recourse against an offset of the promissory note and shall only pursue its other remedies against seller and the shareholders in the event that the promissory note is depleted. Since the buyer released that promissory note voluntarily, why doesn't that bar all these claims? I don't think that that's what Section 10.06 suggests. The words that the parties understand that the buyer shall first seek recourse simply states, I'm saying shall, and if that promissory note is available, you simply withhold. There is nothing that suggests. That's not what it says. It says that shall only pursue other remedies against seller and the shareholders in the event the promissory note is depleted. It wasn't depleted here. It was released. Your client gave up the only cash available to it. So the court is suggesting that this paragraph amounts to an effective release upon paying the proceeds of the promissory note. I'm suggesting that, yes. Yes, and I disagree with that section. I think that remedies ought to be read liberally in favor of a remedy. What the court is suggesting is not something that was ever heard in there. Why do you reach that conclusion in a badly papered but complex commercial transaction with counsel on both sides? Because I don't think that the clause to which the court refers is nearly as clear as Your Honor is suggesting. Well, as a matter of grammar, only is misplaced. It should be shall pursue its other remedies against seller and the shareholders only in the event that the promissory note is depleted. But given that your client, well, I've raised the point. I'm interested to hear what you have to say. Yeah, let me try to address that perhaps more clearly and coherently. What I'm suggesting is that the meaning of that paragraph and the wording of that paragraph in context is that if the promissory note has not been paid, that you take your money out of the promissory note and you can't commence a lawsuit without first taking the money out of the proceeds of the promissory note. But that does not limit your remedies once the $500,000, or in this case with the discount, was paid. That's what I'm suggesting. I do understand the court's position. I disagree with that interpretation. It is not an argument that was raised to the best of my knowledge by the court or either side in the course of this case. And I will concede the point that there are parts of this contract that require interpretation, if you will. Well, you know, one thing I just want to clear up, you think Bitco was defrauded? Yes. And that seems to be what, if there is a fraud, I'm not sure that, you know, what that, the limitations in that contract. Aren't there exceptions there in the case of fraud? Yes. Because that, the problem I have, and apparently the district court didn't do very thorough opinions, is Bitco didn't do anything. For whatever reason, they didn't, I guess, didn't discover these problems until they took over. And then found out a lot of misrepresentations were made, if not this wise. And yet, I don't see where that, that they got after. Maybe that never expires. Maybe as long as somebody is defrauded, you cannot waive it. But that's where, I think that's where the district court kept saying, hey, you guys didn't do anything. And you knew it. And in a tort claim, due diligence would be an issue. This is a contract claim based on an express representation in section 4.19 of the contract, which says that these products that are being produced are up to spec. After the closing occurred, Bitco learns that in fact these products are not up to spec, that they're not being tested properly, that they're being mislabeled. And again, in the words of the district court, that the Peacocks, Mr. Peacock, had been fabricating certificates of analysis out of whole cloth. Now, to the extent that what Bitco knew or didn't know was relevant, Bitco didn't know that, and clearly didn't know it until after the closing took place. So the problem is you think you paid too much. I'm sorry? You paid too much for the company. We paid for what was represented to us essentially, one could argue, as a Cadillac, and we got a Chevrolet. That's the argument. That's the argument, but what's the evidence of harm? The evidence of harm is that we step into the shoes of this company, which Mr. Peacock is running for the first year, including during the time when the promissory note to which the court referred to was paid. We discover that while there are no third-party claims, that we are putting out product that says that there is a quantity, a count of bacteria, and a quality of bacteria that is not true. If you were representing a class of customers, that would be a pretty strong claim. How do we measure, how does anybody decide that cash should go from Peacock to your client and in what quantity? In this case, it was necessary for Bitco to remedy the production problem that didn't cause but was related to the mislabeling problem. What did Bitco do? It had to go out and purchase bacteria that could not be produced in this plant and to put it into the product so that what was going out the door was actually correctly labeled. Where do we find this in the record? It is that the court ended the trial the third day and said, and we were prepared, and in fact you will find a description of this in the court's decisions on the motions for summary judgment. We said, and we were prepared to produce evidence, and we did in the course of summary judgment, to show the difference in price based on the formula that was used to determine the purchase price for this company based on cost and revenues. So it was a matter of taking the additional cost, doing a mathematical calculation. Where do we find all that in the record? It is in the summary judgment decisions of the court. Let me see if I can point to, I'm not certain that I can provide the court with the precise page. I would be happy to do so if the court would like me to. How much was it?  And the difference in value was approximately $3 million based on the calculations that we were prepared to present and were not permitted to present at the close of the third day of trial because the court held, said, looking at this particular paragraph of the contract, I think you have to have third-party claims that have already been made against you in order for that provision of the contract to be brought in. And there had been. I'm sorry? And there had not been any. There had not. What had happened is Betco came in and realized that this was, to coin a phrase, a ticking time bomb. No customer had discovered that this particular product, which is bacteria, was not up to spec. So Betco felt it had a duty. It did have a duty to produce what it said it was producing. It didn't, or it wasn't producing this, so it had to bring it up to spec. That caused a substantial cost, and that is the representation of damages that we were not permitted to put in because of the court's interpretation that there must be existing third-party claims as opposed to merely a clearly defective, mislabeled product. Well, the possibility, I suppose, is that there wouldn't be any claims. I'm sorry? Because maybe the customer wasn't harmed, so there wouldn't be any claims. That is possible. But what company can, as a matter of law, as a matter of conscience, continue to operate producing a product that's mislabeled and intentionally mislabeled at the stage that Betco discovered this? But damages becomes a problem. What do you prove as damages? We have to prove the measure of damages, but we never got to the point except to discuss the fact, is damages based on third-party claims alone? One party makes a third-party claim you have to defend that, or is it based on the reduction in value of the company, which requires a formulation which we prepared at some length to show how we calculated the original price based on an income analysis, EBITDA, the acronym used in the accounting industry, and what we paid and what this company was worth. Did you make an offer of proof on that point? We advised the court what the numbers were, and the court had the numbers. We did not make a formal offer of proof. Okay. If you can direct us to those parts of the record in your rebuttal, that would be very helpful, Mr. Moore. I will. I quickly wanted to ask you a couple of other questions. On your argument that fraud claims were not barred after one year, I looked at your reply brief where you addressed the defendant's waiver argument. Yes. I have to say, if I were the district judge, I'm not sure I would have detected this argument of yours. It took you several pages of piecing things together in your reply brief to argue that you didn't waive it. What's your best shot that a busy district judge would not just have to read between the lines? I'm not going to suggest that the judge did anything other than misread our argument. What I am going to suggest is that we stated very directly that the terms of the asset purchase agreement do not bar Betco's breach of contract claims. You need to be much more specific in your argument, right? You can't just assert the conclusion. I'm sorry? You can't just assert the conclusion. No. I'm looking at your summary judgment brief. We said that Wisconsin law recognizes a breach of contract claim for negligent misrepresentation and for intentional or fraudulent misrepresentation. And if we said somewhat inartfully... Where did you say that? That is... I'm sorry. I would say that's from Harley Davidson. I miscited the statement in the complaint. The statement in the complaint, or excuse me, in the brief, is that the terms of the asset purchase agreement do not bar Betco's breach of contract claims. And we went on to say Betco's contract claims arise under the covenant of good faith and fair dealing rather than specific warranties within the asset purchase agreement and the one-year limitation claims stated in the asset purchase agreement specifically exempts fraud. The reason we were pointing to good faith and fair dealing is that under the Harley Davidson case, citing Wisconsin's TACA case, Wisconsin's law says that in contract, a duty not to defraud other contracting parties is part of the duty to bargain in good faith and fair dealing. May I reserve? Sure. But I'm looking at your 10.05a passage that you rely on. Right. And the phrase, other than fraud or intentional misrepresentation, looks so far out of place, it looks like a category mistake. Notwithstanding any investigation made by or on behalf of any of the parties here, too, or the results of any such investigation, and notwithstanding the participation of such party in the closing, other than fraud or intentional misrepresentation, what does that even refer to? In 10.05a? Yeah, a. A. My red light is on. Go right ahead. Okay. What 10.05a says is that... I know what you want it to mean. I just want you to explain how you get to that meaning from this language. Well, it creates an exception for fraud and intentional misrepresentation. An exception to what? To what? I'm sorry. An exception to what? An exception to the one-year limitation, which appears at the end of the sentence, which is the words shall survive the closing for one year from the closing date. It's that subparagraph that creates the one-year limitation. Interrupts and warranties survive, right? No. This is, well, okay. A cause of action for fraud and misrepresentation survives. Where does it say a cause of action? It says other than fraud or misrepresentation, and then you read also in 10.05e, that notwithstanding anything in this Article 10, nothing shall prevent the parties, including the one-year limitation. Nothing herein. Nothing herein, which would include the one-year limitation. Who knows what herein refers to? Herein refers to Article 10, which is in the first line of the paragraph. So nothing herein shall prevent any of the parties from bringing an action based upon allegations of fraud or other intentional breach of an obligation or with respect to any party in connection with this agreement. So I think 10.05, to the extent there's a difference between the two subsections, sub-e is at least clearer than sub-a, to which the court is referring. I agree that the language requires. It doesn't say anything about a year, right? 10.05a does. Right. And 10.05e refers specifically to Article 10. Thank you, sir. Thank you. Thank you, Mr. Moore. Mr. May it please the court, today I would like to address the two arguments on appeal, the first being that the district court improperly dismissed on summary judgment the intentional breach of contract claim that Betko alleged, and secondly, the argument that the court misconstrued the duty of good faith and fair dealing that was the one claim that actually was tried at the district court level. And your honors have touched on our first argument, which is that Betko waived the argument that 10.05a does not bar count three of the amended complaint, which is breach of contract. If we get to the merits, what do you think 10.05a and that exception for other than fraud or intentional misrepresentation, what do you think it means? I think it means that it would be not a breach of contract claim. It is very inartfully drafted, your honor. Does that mean it's a tort claim? Yeah, I think it would be. If anything, it's a tort claim, but I appreciate the courts pointing out that the time limitation really refers to those reps and warranties. So the best argument I could make on what that means is that those reps and warranties were made in a fraudulent manner prior to the contract being signed, which would give rise to a tort claim. But if you've got a contractual consent to a tort claim, it feels like a contract claim, right? It does. The economic loss doctrine doesn't help you with that, right? It wouldn't help them, correct. It wouldn't help you if the parties to the contract agree that they can sue and tort. Correct. The whole foundation of the economic loss doctrine is contract, right? Correct. Although I think that the APA makes distinction between reps and warranties that are contained in the agreement and reps and warranties that are actions, misrepresentations made in connection with the agreement. And we went through that argument in our response brief. I will agree that this phrase that you point out is very hard to reconcile in the context of 10.05. We think that, first of all, that argument should have been raised at the district court level to be fully evaluated. I would direct the court as well to the record at 102, which is at page 15 of the summary judgment response that Mr. Moore referred to. Their argument on summary judgment was, you know, this language may bar claims other than fraud or misrepresentation brought against the Peacocks for breach of specific representations and warranties contained in the terms of the APA. If you look at count three of the amended complaint, what they are alleging are breaches of reps and warranties contained in the asset purchase agreement. It's understandable the district court and my client would read that statement to mean we agree with you. We agree that these claims do not exist because of 10.05. And then, after the district court ruled on summary judgment, noting that Betko had conceded this argument, the court, you know, said they failed to raise any argument on that point. It would have been prudent at that point for Betko to move for reconsideration or move to correct the error that the court misread their argument. Instead, Betko did nothing, and we proceeded on to a trial on one single issue. So there's a lot of things waved in, I guess you're basically saying, because it looks to me like, I don't want to say knowingly, intentionally, whatever, your client deceived them and knew these misrepresentations were going on. And even internally they knew it, but they were afraid that, what's his name, Malcolm, would fire him if he said anything. And it just, everything I'm hearing here is they just didn't plead it. They didn't put their case before us that they would win on, or at least have a chance of winning. And the other thing, when I look at that and then see where not only that, but they were stung and you were awarded $750,000 in attorney's fees. You know, this is, it's troubling to me, but it looks like they missed the boat. That's all. And that's basically what you're saying. It is, Your Honor. In addition, I'd say, let's assume for purposes of argument here that the district court improperly dismissed their claim on summary judgment and they should have been able to try that case when they tried their other implied breach duty claim at a trial. What would have happened? The court considered all evidence regarding what happened after the asset purchase agreement was signed, when my client, Malcolm Peacock, was ostensibly the president of Betco. And the evidence that came in, the court considered it, the record is full of factual findings by the court. The court has already addressed whether 4.19, which is the basis for their intentional breach of contract, the court has already addressed the facts surrounding that provision and what the parties did with respect to 4.19. So if the court were to remand this case back for a trial on intentional breach of 4.19, the evidence would come in the same. The court has not found evidence of injury or harm to Betco arising from that breach. Because the customer didn't complain. Correct, Your Honor. Even though they were getting less than they bargained for or whatever. That didn't matter. They didn't say anything, whatever. I don't quite understand with this. The only thing I understand are septic systems. Is this sort of like that? It's sort of like that. It's a microbiological process where they're used as cleaning agents. So there's a measurement of the active enzyme that is used in these products. In the complaint, what were the damages alleged to be? They were nonspecific, Your Honor, as far as they were some damages to be proved at trial. Your colleague has told us that they had evidence of damages but weren't allowed to present it. I disagree with that argument. First of all, at the end of the trial in the court's oral ruling, the court asked are you prepared to put on evidence of the damages, and I believe the response from Mr. Moore was we are not at this time. And that would be found at the record in the transcript starting at the Appendix 70. Excuse me, it's Appendix 59. Any particular page on that? Yes, I'm looking for it, Your Honor. Page Appendix 68. The court said, I will hear briefly from plaintiff if they believe they have damages they can show that arise directly out of sales of product with inaccurate certificates of analysis or product before acquisition or post-acquisition. Mr. Jackson replied, on the issue of can we introduce evidence of bad customers, claims that they have made about defective product, we're not prepared to provide that evidence at this time. They didn't make any. The customers took what they got, and I guess it worked somewhat, and they didn't come back and say this really isn't working, even though internally Peacock knew that. Correct, Your Honor. That's where we are. In response, the court said I understand when they said they couldn't produce any evidence at that time, and for that reason, the court says, I'm going to find no breach of the duty of good faith. Correct. We believe the district court properly made that ruling, and that ruling should be affirmed. What do you think of paragraph 10.06 on the promissory note? I like the fact that another set of eyes have looked at this and found something that seems to be another reason why these claims are barred. Apparently this is the first time that issue is being raised. It is, Your Honor. Was it waived? No, Your Honor, it's not waived. I'd be happy to address any other questions. Well, let me just put it this way. The thing that's most troubling about your position is that it seems to leave no remedy for systemic falsification of the quality of the product, both before and after the close of the sale. My response to that, Your Honor, is that Betco had full opportunity to review, in the period between when the closing occurred and they paid out the promissory note, they were running the plant, and I would refer this court to the district court's factual findings on what actually happened during that time period. The district court found that Betco never asked Mr. Peacock to give them information about the, in this case, the certificates of analysis, and, in fact, ignored reports from their employees who raised this issue to Betco within the one-year period. Yeah, well, Malcolm Peacock ran the place for another year, and some people were afraid to say anything because he'd get fired. I mean, this is very weird, and I'm kind of disappointed, and, frankly, that your client got $750,000 in attorney's fees in addition to all this. But this is what we have, and I guess we're stuck with that. Your Honor, I'd also refer you to the record at 209, the court's trial ruling. While the court did find that there were certificates of analysis that were produced that were not factually based, the court made specific rulings about Malcolm Peacock's interaction with employees and found evidence lacking to show that Mr. Peacock had run this regime of no discussion or he was going to fire employees, and that, again, is at the court's trial decision at Record 209. Thank you. Thank you. Mr. Moore, I'll give you two more minutes to make any response. I will respond as quickly as I can to the specific question raised. The discussion regarding damages is at Appendix 47, A47, which is the court's decision issued one week before trial. The court understood what the measure of damages was that we were proposing. At A68, which is the court's oral ruling to which counsel referred, what the judge did was ask Mr. Jackson a question specific to whether there was proof of an arising injury, that is, a third-party claim, and Mr. Jackson truthfully said, no, we are not prepared to produce that. What we had shown the court before was the evidence we were going to put on. I think that the court expressed it exactly right. The intent of this contract was to contract around the economic loss doctrine, and it was also to contract around any one-year limitation insofar as there was fraud and misrepresentation involved, and I understand the court has read that section differently. I also want to point out with regard to waiver, there is no duty that I'm aware of anywhere that suggests that there's a duty on the part of counsel to bring a motion to reconsider when the court gets around. I'm not aware of any case law to that effect. What went on between the time of that initial ruling and the written opinion? A lot of months, wasn't it? We had the written decision three and a half months, and the last paragraph of the written decision invited a second round of summary judgment briefing that resulted in dismissal of the tort claims under the economic loss doctrine. That was the sequence of events. And do I wish that we had brought a motion to reconsider? Absolutely, in the present context. I can't suggest anything other than that. And finally, I'll point out that in the grand substance here, the court has correctly identified the way septic systems work. You put a little bacteria in a septic system, and it will eventually work because bacteria grows. But for municipalities, they require a certain level, and they require a certificate of analysis that's truthfully prepared. Thank you. Thank you. Thanks to both counsel, and the case is taken under advisement.